PHILLIP PLUNKETT *vs.* PATRICK DILLON.

PATRICK DILLON *vs.* PHILLIP PLUNKETT.

*New Castle, Sept. T. 1871.*

A written agreement for the advance by Plunkett of $3000, to Dillon for the purchase of land to be improved by subdivision into building lots and by building on such lots, the title being taken by Dillon and being secured by Dillon's judgment bond, stipulated for the payment, in addition to legal interest, of two-thirds of the profits on the venture, the money so advanced being at no substantial risk, and the parties by their acts treating it as a loan, *Held*, to be in fact an agreement for a loan, and not a partnership, and as such usurious.

Such an agreement *held also*, to be hard and unconscionable, and, as such, while it remains executory, it will not be enforced by a court of equity.

Whether a particular transaction is in fact a partnership or a loan, must depend, not on what the parties may say or choose to call it, but upon their actual course of dealings in relation to it ; and the obligations and responsibilities to which they do in fact hold each other. And in a conflict between the words and acts of the parties as to what was the real nature of the transaction, the conclusion to be drawn from their acts must prevail.

It is an acknowledged exception to the Statute of Usury, that when the principal is put at risk, more than the legal rate of interest may be received; the excess, in such case, being allowed as a consideration for the risk of the principal in addition to the interest, which is the consideration for the for-bearance of the debt. But the risk of the principal, to come within this exception, must be a substantial one. And in determining whether it be such the transaction will be subjected to the most searching scrutiny,

The principle upon which equity deals with hard and unconscionable bargains is this; when the contract is already executed or the party can enforce his advantage at law without the aid of a court of equity, the latter will not interfere to set it aside or to restrain such party on the mere ground that the bargain is hard or unreasonable; but when a hard contract remains executory and the party not being able to effect his unconscientious advantage at law, seeks the aid of a court of equity, it will not help him.

The omission of a paper from the list of exhibits resulting from misunderstanding or inadvertence on the part of counsel, may, under the practice of this Court, be corrected by leave to amend, when this will work no surprise to the opposite party.

The examination of witnesses *viva voce* to prove exhibits at the hearing is an exception to the established course of practice to proceed upon written evidence. Such proof is always confined to few classes of instruments, of such nature as to require merely formal proof without cross-examination. And where the proof of any paper would go beyond this, it cannot be proved at the hearing.

Where an instrument is impeached by the answer of the adverse party it cannot be proved as an exhibit at the hearing, as against the party impeaching it.

Rule 49 as to the proof of exhibits is not intended to introduce a new practice but is merely a general expression of the practice of the Court of Chancery on that subject, according to which it is to be construed.

The purpose of Rule 45 is not to indicate a relaxation of the practice of taking proofs out of Court, but is a provision, to be very sparingly resorted to, for any special cases in which upon some particular point it may be found necessary for the satisfaction of the Court that a witness should be orally examined or re-examined.

It is the settled practice of the Court, in its discretion, to grant leave to supply evidence inadvertently omitted to be taken in the regular course, when it may be material to the justice of the cause, and its admission has been without bad faith or laches.

The execution of an agreement in writing and the time, place and circumstances of it being made may, for all purposes, be proved by parol. It is with respect to the terms and contents that such proof is excluded. Where,

however the making of a written agreement is in issue, and not its terms, evidence of admissions with respect to its terms and contents may become relevant and admissible as tending to prove the fact of its execution.

An inquiry as to the execution of a paper already made a part of the record may state the contents of the paper as descriptive of it, without being objectionable as leading or as an attempt to prove by parol the contents of a written paper.

While it is the rule in equity as at law that the terms or result of a settlement of private accounts cannot be proved by parol without preliminary proof of loss or notice to produce, as the case may be, yet when testimony is taken upon written interrogatories filed, the proceeding must necessarily be to take the answers of witnesses to such interrogatories as the party chooses to put, with a view to prove the contents of a paper but subject to exceptions to the depositions, when published, for want of proper preliminary proof of loss or notice.

When the controversy is one between two individuals with respect to their mutual transactions as such, evidence respecting a claim of the complainant against the defendant and another as partners, is inadmissible.

The rule that the proofs must correspond with the allegations, is strictly enforced in equity as well as at law.

Where an allegation is so uncertain as to be demurrable proof is not admissible to support it.

BILL IN EQUITY FOR AN INJUNCTION AND ACCOUNT, AND CROSS-BILL.—The original bill was filed by Plunkett to obtain an injunction to restrain Dillon from proceeding against him in two suits at law and for the establishment of a settlement alleged to have been made between them or if that be rejected as a settlement then for an account between the parties. The original bill was filed in November 1870 and Dillon's answer was filed at the ensuing February term. The allegations of this bill and answer have been fully set forth in the report of this case as it arose upon a motion to dissolve.* It is unnecessary therefore to repeat them here, but only to refer to that statement of them. Upon the refusal of the motion to dissolve the injunction the Chancellor ordered Dillon to file a cross-

*3 Del. Ch. 496.

bill and that Plunkett should answer it in order to put the cause in such condition as to enable the Court to adjudicate fully the controversies between them.

In June, a. d. 1871, the defendant filed his cross-bill against the complainant setting forth the same facts substantially as were previously alleged in his answer and stating in detail the various errors claimed in the alleged settlement of accounts and upon which Dillon claimed a large balance to be due him on a proper settlement. The cross-bill prayed for an account. a decree for the payment of the amount found to be due to Dillon, that the original suit and the cross-bill might be heard as one and that the judgment for $3000 entered by Plunkett might be set aside, and cancelled and its collection perpetually restrained. To this cross-bill Plunkett answered. Upon the issues raised·upon the bill and answer and the cross-bill and answer depositions were taken by both parties.

The testimony taken on both sides was principally directed to the question of the existence of the alleged partnership, and consisted largely of proof of admissions of the parties respectively. The view taken of the case by the Court, however, renders unnecessary to detail the testimony, such portions of it as were material being sufficiently stated in the opinion. on the final hearing.

To the complainant's interrogatories exceptions were filed some of which were material.

Among the complainant's interrogatories excepted to were the following :

3. Has Patrick Dillon spoken of or admitted to you or in your hearing of the existence or making of any agreement between him and Phillip Plunkett the complainant regarding a tract of land on the easterly side of Madison street in the City of Wilmington, between Second

26—DEL. CH. IV.

and Third streets ?   If yea, state fully how often, when, where, under what. circumstances, in whose presence, to whom, and what he said relating to any such matter ; and, as to the purchase, terms on which said land was held (if so held,) and what was to be done with it or its proceeds ? If he spoke or made any admission of such agreement, did he or not say it was in writing or otherwise ?

5. Did you at any time, and, if ·yea, when, sign an agreement to take of Patrick Dillon one or. more houses which he was about to erect on Madison street between Second and Third streets, at the price of $1900 each ? Were such houses afterwards built by Dillon and conveyed to you under such agreement ?   If so, when ? and at what price conveyed to and received and paid for by you ?   and at what prices did he sell others of said houses to other persons ?   Were they all built substantially alike, or differently ?   If not alike wherein did they differ ?   What was the full and fair actual worth by the foot, without buildings, of the several lots, at the time it or they were conveyed to you or such other person or persons ?

9. Has Patrick Dillon at any time and if yea, when, recognized, assented to or admitted in your presence or hearing a settlement of accounts between him and Phillip Plunkett on or about November 20th, 1867, June 28th, 1869 or at any other time, and when ?   If yea, what was the state of their accounts at such time or times as to indebtedness, and what was the result of such settlement ?   was any book or book-entries referred to on such occasion or occasions ?   If yea, produce or refer to such book or entries, or indicate it in such manner that it may be produced and identified at the hearing of this cause."

10. Do you know anything of an alleged note or due bill for $615.67 being made by Patrick Dillon and delivered to Phillip Plunkett on or about the 20th day of November 1867, payable one day after date, in settlement of the

accounts at that date? If yea, state fully all you know respecting the making and delivery of such note, due-bill or settlement, state what became of the note or due bill if you know, and whether it is now in existence?

12. Were you or not during the year 1868 in partnership in business with Patrick Dillon and did you or not during said year borrow any money from Phillip Plunkett in the copartnership name? If yea, when, what sum or sums and what security or evidence did you give said Plunkett of and for such loan, and how or in what shape was such loan made to you?

The several grounds of exception taken to the foregoing interrogatories were as follows:

I. To the 3rd interrogatory it was excepted:

1. That it seeks testimony as to the substance of an agreement and then inquires whether it was in writing or by parol instead of first ascertaining whether, if there were any agreement, it was in writing, in which case no inquiry into its contents is admissible until after a failure to prove the writing properly accounted for.

2. The bill alleging an agreement in writing, evidence of a verbal agreement would be inadmissible.

3. Any such agreement, as referred to, concerning lands, would be within the Statute of Frauds and parol evidence concerning it would be inadmissible.

III. To the 5th interrogatory it was excepted:

1. That the first paragraph thereof is leading, and also seeks to prove the execution and contents of a written paper by parol admissions of a party thereto, of both which facts parol proof of the admissions of the party would be secondary evidence.

2. In the inquiry " were such houses afterwards built " by Dillon and conveyed to you under such agreement?

" If so, when ? and at what price conveyed to and received " and paid for by you ? and at what price did he sell others " of said houses to other persons ?" the complainant seeks to prove conveyances and considerations thereof, of which the best evidence is the deed or deeds of conveyance or the record thereof.

IV. To the 9th interrogatory the defendent excepts :

1. That it seeks to elicit testimony as to a settlement referred to as of Nov. 20, 1867 whereas no such settlement is alleged or referred to in the bill.

2. That it is leading so far as it refers to the dates of alleged settlements instead of inquiring generally as to any settlements, and if so, when.

3. All the concluding part of the interrogatory commencing "If yea, what was the state of their accounts "&c.," seek to elicit testimony as to the contents of a book or books of account of which the best proof (as appears by the interrogatory itself) is to be found in the original or originals which if within the possession or control of complainant must be produced or otherwise cannot be proved until after notice to the defendant to produce the same.

V. To the 10th interrogatory the defendant excepts, so far as it relates to a due bill referred to, that it is leading and also seeks to prove the contents of a written paper by parol testimony.

VI. To the 12th interrogatory the defendant excepts in that it is an inquiry concerning matters not alleged in evidence.

The exceptions were argued September 11, 1871.

*G. H. Bates*, for the exceptant.

*Patterson*, in support of the interrogatories.

THE CHANCELLOR :—

The 1st exception is to the 3rd interrogatory.

So far as this interrogatory inquires whether Dillon had admitted the existence or making of the agreement referred to, and the time, place and circumstances of such admission, it is unobjectionable though the agreement were in writing. It is with respect to the terms and contents of a written instrument that parol proof is excluded. The execution of an agreement and the time, place and circumstances of its being made may, for all purposes, be proved by parol.

The inquiry as to the "terms on which such land " was held and what was to be done with it or its pro- "ceeds," would be inadmissible, if nothing were in issue respecting the agreement but its *contents*; for the complainant himself alleges that the agreement was in writing and is in his possession, and sets forth a copy of it in his bill.

The relief sought is not to have the agreement reformed on the ground of mistake or fraud, but to have it enforced precisely as it stands. No parol proof therefore is necessary or admissible to shew its terms or provisions; and if the evidence sought could have no other effect than this, these inquries would be stricken out.

But the answer denies that Dillon ever signed such an agreement, and alleges that if he did sign it he was ignorant of its contents and that his signature to it was obtained " fraudulently and upon false representations by "complainant of and concerning the contents thereof." To the issues thus raised the evidence is relevant and although by parol it is admissible because it does not contradict or vary the terms of a written instrument. The alleged fraud is matter *in pais* collateral to the contents of the paper; and may be either proved or disproved by parol evidence.

This interrogatory must be allowed, but I should add that any evidence taken under it will be strictly confined in the consideration of the Court to the question whether the paper was signed, and if so, whether the signature was fraudulently obtained. It can have no effect as proof of the terms of the argreement.

The 3rd exception is to the 5th interrogatory.

The first question is excepted to as leading and as directed to prove by parol admissions the contents of the paper referred to.

The paper referred to is the agreement by Plunkett and others to purchase certain houses from Dillon, the agreement being annexed to the answer and made part of the defendant's case. The inquiry is whether the witness. signed such agreement, it being described by a reference to the property, and price of the houses, and if so at what time. It is not an attempt to prove by parol the contents of a written paper which has not been produced, for the paper is part of the case. Nor is there an attempt to contradict the terms of the paper or vary it by parol evidence: for the interrogatory states the contents of the paper precisely as they appear on its face. The interrogatory, stating the contents merely as descriptive of the paper, inquires whether witness signed it and when. The fact of the signature is matter *in pais* always provable by parol ; the time in this case may also be proved by parol, for the paper does not shew any date. The object of the evidence as suggested is to supply the want of date. That is perfectly legitimate and could not be effected without stating the contents of the paper so as to identify it to the mind of the witness. For complainant cannot produce it to the witness. It would be otherwise were this a paper not already made part of the record—one therefore presumed to be in the complainent's possession, or in the possession of some third person in which case he

would have to account for its production, or in the possession of the defendant in which case notice to produce would be requisite.

The 4th exception is to the 9th interrogatory.

It is not clear whether the witness is here expected to prove that a settlement was made in his presence or hearing on 20th Nov. '67 or 28th June '69, or at some other time, the terms of which the witness is to state from his own cognizance of them ; or whether the object is only to prove that Dillon had admitted to the witness the fact of a settlement previously made and himself stated the terms of it. The former seems most likely to be the meaning and I will so assume.

One ground of exception taken to this interrogatory is that no settlement of November 20, 1867 is in issue. That is true ; and no such settlement could be admitted in proof as a ground for any relief founded upon its terms or result. But it is possible that the result of a settlement made November 20th, 1867 might tend to sustain some particular of the settlement alleged to have been made June 28th, 1869 which is the settlement in issue, and for such a purpose the evidence sought would be admissible. The object suggested in the argument is to sustain the charge made against Dillon for the note of $615.67 dated November 20th, 1867. This charge might be sustained by proof that upon a settlement of accounts made November 20th, 1867, Dillon was found due to Plunkett, $615.67, and that a note was given for that sum. Any such settlement of November 20th, 1867, if proved at all, would be available to that extent, but not as a substantial ground of relief.

Another ground of exception taken is to that part of the interrogatory which inquires as to the state of the accounts and results of the settlement.

Now it is certain that the terms or the result of a settlement of private accounts which was made in writing or figures cannot be proved by parol, except it appear that the written evidence of the settlement has been lost or destroyed,—to shew which, there must be evidence of due search,—or, unless the writing, being in possession of the adverse party, he refuses, upon due notice to produce it. This is the rule both at law and in equity, and whether the testimony be taken orally or upon written interrogatories. *Gresley's Eq. Ev.* 191, &c.; 1 *Ves. Sr.* 235, 505; 2 *Ves. Sr.* 90. But there is this difference in proceeding by oral and written examination. Where the testimony is taken upon oral examination, there is opportunity to determine preliminarily the question whether there has been due search for the original to shew its loss or destruction, or whether due notice has been given for the production of a paper held by the adverse party. The Court therefore on oral examinations inquires and determines these points before allowing the witness to speak at all as to the contents of the paper. In like manner would an examiner proceed in taking testimony upon oral examination, subject to the right of exception to his decision upon the preliminary question. But wherever the testimony is taken upon written interrogatories filed, there is no opportunity for any decision as to the fact of due search or notice as a preliminary condition to the proof of contents. This can only be done by the Court upon reading the depositions after they are published. . The proceeding therefore must necessarily be to take the answers of witnesses to such interrogatories as the party chooses to put with a view to prove the contents of a paper but subject to exception to the depositions when published for the want of any proof, or of sufficient proof as to the loss or destruction of the paper, or of notice to produce it, and if this preliminary proof does not appear in the depositions the answer of the witness touching the terms or contents of the writing will be suppressed.

In the present interrogatory the inquiries as to the fact of a settlement having been made—whether any book or book entries were referred to,—and calling for the production of any such book or information as to its present custody, are admissible without any preliminary proof. The inquiry based on the assumed fact of a settlement, in these words, "what was the state of their accounts at "such time or times as to indebtedness and what was the "result of such settlement?" is not admissible unless accompanied by the usual preliminary evidence of due search for the original settlement or that Dillon has it with notice to produce it.   If such evidence do not appear upon the publication of the depositions the answers to this inquiry will be suppressed.

We might require the preliminary questions to be put in the interrogatories filed :—but the sufficiency of the evidence of search or notice would still be necessarily open, so that, in all events, the secondary proof of contents must be taken in the first instance.   On the whole, the most convenient course is to let the party proceed in all cases at his peril and if he wholly omits the preliminary inquiries take the certain consequence.

There is another objection to the form of the inquiry as to the fact of a settlement, that it is leading, in suggesting the date of the settlement inquired about.   This objection is well taken.   The inquiry should be first generally whether the witness was present at any settlement made at any time, and when ?  followed by the more specific inquiry to be put, if the general inquiry is answered in the affirmative, viz :  If you have answered yea, then say whether such settlement was, or was not, made on or about the 20th of November 1867 ?   The object is to allow the witness first to answer upon his unassisted recollection.   After that, inasmuch as he might not at first be enabled to call the date correctly, it may be suggested to him.   If the commissioner does his duty he will

27—DEL. CH. IV.

first exhaust the witness' recollection and take his answer in full, under the general interrogatory, before the specific one is read to the witness.

The complainant's counsel will have leave to amend the interrogatory in this particular ; and it ought to be amended further so as to shew clearly whether the witness is inquired of about a settlement in his presence or only as to Dillon's admission of one having been made, the witness having himself no personal knowledge of it.

The 5th exception is to part of the 10th interrogatory.

So far as this interrogatory seeks to prove the amount, date and terms of payment of the note inquired about, it is subject to the remarks before made as to proof of contents of a written instrument. Answers to these points may be taken but they will be subject to exception, upon publication of the depositions, for want of the preliminary proof for the admission of such evidence, *i. e.* proof of the existence of the note, its loss or destruction, or that it has come to Dillon's possession, with notice to produce it.

There is, however, an objection well-taken to the *form* of this interrogatory, that it is leading. It fully describes the note, stating all its essential contents in the first instance suggesting to the witness all the particulars described to be proved, and requiring only a categorical answer, yes. This is unnecessary and inadmissible. The witness should be first asked whether he was present at the giving of *any* note by Dillon to Plunkett. Then he should be requested to state, without assistance, all his knowledge respecting the note, the time, place and circumstances, of the making of it, the date, amount and time of payment. When his recollection has been exhausted and his answer taken down, then a more specific interrogatory may be read to him, viz., whether the note, supposing he has proved any was not of such a date, or of such an amount. or of such

a time of payment. He may also be then interrogated as to his knowledge touching the present existence or custody of the note.

The exception to the form of the interrogatory is allowed with leave to amend.

The 6th and last exception is to the 12th interrogatory.

This interrogatory seeks to prove an indebtedness to Plunkett, by a partnership of which Dillon was a member, for some unspecified sums of money borrowed from Plunkett by Dillon's copartner on the partnership account.

The interrogatory is inadmissible because the matters inquired about are wholly irrelevant to the issues in this cause ;—both the issues raised by the original bill and answer, and by the cross-bill and answer.

This will appear from one very short but decisive consideration. This whole cause, as it arises, both upon the original and the cross-bills, is one between Plunkett and Dillon individually. Plunkett files his bill against Dillon as sole defendant :—Dillon files his cross-bill as sole complainant,—both bills relating to the same transactions, and those transactions in which the liabilities charged against Dillon by the original bill and the claims, made by him in the cross-bill, were several and not joint with any one else. Now without looking to see what are the allegations of the bills and answers, or the precise claims made by the respective parties, it may be confidently affirmed that no partnership debt of Dillon and some one else could be properly embraced. The state of the parties alone, Dillon being sole defendant to the bill and sole complainant in the cross-bill, precludes any partnership claims,—unless it were one which Dillon had assumed separately ; and had such claims been alleged in the complainant's bill, his bill would, to that extent, have

been demurrable, first, for want of proper parties in not giving the co-partner as a defendant; and again, even if the co-partner had been joined, the bill might have been objected to as multifarious in joining, in ·one suit, demands both several and joint.

. We see then, without examining the allegations on record, that the subject-matter of the interrogatory must be irrelevant to any issues that could arise in this cause.

But looking into the papers, there does not appear to be any allegation in either of the bills or answers, to which the matter of the interrogatory can be . relevant. The complainant has not, either in his original bill, or in his answer to the cross-bill, set up against Dillon any claim to which the interrogatory can apply.

What is the complainant's claim in the original bill ?

It is twofold. :—

1. He claims his share of the proceeds of certain lots sold by Dillon under the alleged agreement of 1864; this claim is embraced in paragraphs 1 to 6 inclusive.

2. He also claims to be paid further sums specified in Par. 7. These are;

1. Certain loans to Dillon to the amount of $954 and upwards, for which due bills were given.

2. $28 for building stone.

3. $341.75 due from Dillon as surviving partner of the firm of Dillon & Plunkett.

4. A due bill of Dillon for $10.

Having stated these as complainant's claims, the bill proceeds—paragraph 8—to allege the settlement of 28th June, 1869, as a settlement of all claims between the parties, the result of which was a balance of $334.17 due complainant for which Dillon gave his note. Then the bill, after

stating proceedings at law, in the 9th, 10th and 11th paragraphs, again takes up the settlement in the 12th paragraph and alleges, specifically, sundry mistakes in it. These mistakes relate partly to certain proceeds of sale of the lots which had not been included in the settlement; and in addition to these, the only other mistake specified, is the omission in the settlement of the balance of account $341.77 charged to be due from Dillon, as surviving partner of Dillon and Plunkett.

Then follows the prayer, which is a double one, in the alternative.

1. That the settlement, if admitted by the answer, may be established with the correction of the mistakes before specified.

2. That if the settlement be not admitted, (the complainant having, as he has before alleged, no evidence of it,) then the defendant be decreed to account,—for what ?

1. For the proceeds of the lots disposed of.

2. For all moneys loaned by complainant to Dillon,— not to any partnership in which Dillon was concerned— particularly the amounts of the due bills, being those referred to in par. 7.

3. For stone or other merchandise purchased of complainant.

4. For " any other credit to which complainant may " be entitled in account with him," Dillon.

We see then that neither the allegations of the bill nor the prayer, taken in either of its alternatives, undertake to embrace claims against any firm of which Dillon might have been a member, except the claim against him as surviving partner of Dillon & Plunkett.

What the complainant relied on in argument was, the general settlement in par. 7, that complainant had " at

sundry times advanced by way of loan to defendant " *i. e.* to Dillon only, not to any partnersip, large sum of money, for portion of which defendant gave him due bills &c. amounting to $954." This statement implies that complainant had loaned to defendant other sums besides those for which the due bills were given :—and it was argued that the twelfth interrogatory was relevant to prove those additional loans of the sums for which due bills were not given. It was argued that this statement of par. 7 is to be taken in connection with par. 3, which alleges generally, that Plunkett had been in the habit of making advances to Dillon, the course of his business of buying and improving lots and selling them at a profit ; Plunkett being repaid out of the proceedes of sales so that, according to the argument, the twelfth interrogatory is relevant to prove the general allegation raised out of par.'s, 3 and 7, that Plunkett had made large advances to Dillon in the latter's transactions of real estate. But it need be hardly be said that proof of loans made to a partnership of which Dillon was a member cannot be relevant to an alleged claim for advances made to Dillon only in the course of a private business, unknown to such partnership.

It may be worth while here to observe how strict is the rule in equity as well as at law that the proofs must correspond with the allegations. Says *Daniel,* 2 *Vol.* 992 ; " It is a fundamental maxim both in this court and in " courts of law that no proof can be admitted of any mat- " ter which is not noticed in the pleadings ; this maxim "has been adopted in order to obviate the great inconveni- " ence to which parties would be exposed if they were lia- " ble to be affected by evidence at the hearings of the "intention to produce which they had no notice." *Sto. Eq. Pl.* 28 *and* 257. It is true a general charge or statement of the matter replied on, is sufficient ,—the particular circumstances or facts which tend to support the charge, are matters of evidence and need not be stated ;

*e. g.* insanity or drunkeness may be charged and the particular act given in evidence. 2 *Daniel* 993. Taking the rule as thus qualified there is no general allegation or claim of a partnership indebtedness such as the 12th interrogatory could tend to support.

But there is another rule which ought not to be overlooked,and which would exclude any evidence under mere general allegations of advances or loans to defendant without any specification of them ; such as the general statement of par. 7 relied on, that complainant " has at " sundry times advanced by way of loan to defendant " large sums of money." Such an allegation is too uncertain to raise any issue for proof :—a defendant cannot know what he is called to meet under it. It is demurrable and proof is not admissible to support it. The rule as to what is sufficiently certain in allegations is stated and many illustrations given in *Sto. Eq. Pl.* 241-2-3-4, 244 *a.* *&c.* The example cited from 3 *Beavan* 18, is similar, where allegations to this effect, that " certain dealings and trans- " actions took place between the bankrupt and the defend- " ant," that by virtue of certain agreements for leases the bankrupt was possessed of certain leasehold houses which the bill specified ; that the defendant *from time to time made certain loans to the bankrupt, &c.*, were all too uncertain to put the defendant to a discovery by answer. Looking at a case like the present it would be manifestly oppressive to allow a complainant having claims against a defendant which he must know all about, instead of specifying them as to amounts, dates and nature of the claim, whether note, bond or book account, simply to allege a general indebtedness, leaving the defendant to answer and go into his proofs wholly in the dark as to what precisely he is called to meet. Such a defendant would be even worse off in equity where the pleadings are supposed to be specific than in a court of law where they are general, for even then he may protect himself by calling for a bill of particulars.

Perhaps before leaving the bill I should notice the concluding part of the 5th prayer on this point. That prayer is that if the settlement of 28th June 1869 be not established the defendant may be decreed to account for the proceeds of lots sold,—also for monies paid or loaned *to him,* Dillon,—which could not be held to include any partnership claim ;—also for store or other merchandise purchased of complainant ;—and, the prayer concludes, "*of any other credit to which complainant may be entitled* "*in account with him.*" This prayer is broad, but yet cannot cover the matter of the 12th interrogatory ; for it applies to credits not against any partnership but against Dillon individually, such as can be allowed in an account in this suit, which being, as we have noticed, against Dillon alone, can include only claims or credits against him severally and not joint claims or credits against him and others not parties to the cause. I do not mean to imply that were this prayer broad enough in terms to include partnership credits that would warrant evidence not supported by any allegation of such indebtedness. It would not. The prayer however, in its terms fairly applies only to credits against Dillon individually.

Looking next into Dillon's answer, I can find no allegation there to which the 12th interrogatory is relevant ? Nor is there any in the cross-bill and the answer to that. These embrace the same matters of controversy and present the same issues as the original bill and answer. The only difference is that, by the cross-bill, Dillon is enabled to pray a decree in his favor for any balance found due to him arising out of the same transactions set forth in the original bill and answer, which he could not do by his answer to the original bill.

The 6th exception is allowed.

.THE CASE CAME ON for hearing on October 12, 1871, at the adjourned September Term.

Leave to amend the list of exhibits.

Before the hearing commenced *Patterson* for complainant, inquired whether, under a notice in his list of exhibits of a book account of complainant against the defendant, he would be allowed to give in evidence an account of complainant against the late firm of Dillon & Plunkett, both accounts being in the same book.

THE CHANCELLOR:—

The notice in the list filed must be confined to the account specified. That being an account against the defendant individually cannot include another distinct account against a partnership of which he was a member. It can make no difference that the two accounts happen to be in the same book.

*Patterson* then asked leave to amend his list of exhibits, by adding, as an exhibit, the account of complainant against Dillon and Plunkett, stating that it had been omitted through a misunderstanding between him and the complainant, that he had supposed the account to be for cash and only understood this morning that it was for matter proper to a book entry.

Objected to by the solicitors for the defendant.

THE CHANCELLOR:—

This appears to be one of those omissions resulting from misunderstanding or inadvertence on the part of counsel which the practice of the Court allows to be corrected by amendment where this will work no surprise to the adverse party. In this case the complainant's claim against Dillon and Plunkett was alleged in the bill and is one of the issues in the cause. No new matter is proposed to be introduced, but only that a defect be supplied in the notice of proof of a matter alleged. If upon the production and proof of the account it shall appear that the defendant will require further time or opportunity to rebut or

discredit this piece of evidence, it will be accorded to him. The leave is granted.

After the reading of the papers, *Patterson*, for the complainant, offered to prove as an exhibit, by Wm. Bright the attesting witness, the agreement of August 1864 referred to in the bill and before set out in full.*

*G. H. Bates*, for the defendant, objected. No paper requiring more proof as to execution than of mere handwriting can be offered as an exhibit. Nothing more than the formal proof is admissible. 2 *Dan. Ch. Pr.* 1026 ; *Blockston vs. Drewit, Prac. in Cha.* 64 ; *Harris vs. Ingledew*, 3 *P. Wms.* 91 ; *Eade vs. Lingood*, 1 *Atk.* 203 ; *Pomfret vs. Windsor*, 2 *Ves. Sr*, 479 ; *Lake vs. Skinner*, 1 *Jac.* & *Walk.* 15.

Applying this rule, this paper requires other proof than of handwriting to render it admissible, *i. e.*,

1. That it was executed on the day of the date of the judgment bond referred to in it, so as to fix the time of its execution,—the date on its face being blank.

2. It does not appear *on its face* that Bright was an attesting witness ;—that would have to be proved.

Another objection is that this agreement is impeached by the answer. When the execution of a paper is impeached it cannot be proved as an exhibit. 2 *Dan. Ch. Pr.* 1028 ; 2 *Gr. on Ev. Secs.* 309-10 ; *Barfield vs. Kelly*, 4 *Russ.* 355 ; *Atty. Gen. vs. Pearson*, 7 *Sim.* 290 ; 1 *Barb. Ch. Pr.* 310. *Book I. Ch.* 10, *Sec.* 3.

If this proof is excluded, the omission to introduce it at the proper time cannot be supplied. The opportunity sometimes given to make the proof upon interrogatories is an indulgence granted only where the omission is satisfactorily accounted for without any laches. *Hood vs. Pimm*, 4 *Sim.* 101 ; *Wyld vs. Ward*, 2 *Yo.* & *Jer.* 381.

*See 3 Del. Ch. 497.

In this case the omission is a clear neglect, for this agreement is the basis of complainant's claim, and he had full notice by the answers of an intention to impeach it. He must therefore be taken to have known of the necessity of making the usual proof.

*Patterson*, for the complainant.

This paper is set forth verbatim in the bill and the list of exhibits was filed Aug. 21, 1871, so that the objection fails upon any ground of surprise. We have been less formal than usual in these proceedings in consequence of a general disposition on both sides to accommodate the course of the cause toward a speedy and convenient disposal.

In the cases cited justice was sacrificed to an arbitrary rule which should have been relaxed, and opportunity afforded to take testimony essential to the right of the parties, where this could be done without surprise or prejudice to the adverse party such cases are not to be followed.

Our rules provide for taking oral testimony at large in the Court, in a proper case, unlike the English practice. If this proof is inadmissible as an exhibit, the case can be met under rule 45 with full justice to all parties. But this is not necessary. Rule 49 is general, embracing *all* cases where proof of handwriting only is required, without any qualification excluding a writing because it is impeached. This rule in its broad terms supersedes the English practice as to proof of exhibits.

The rule of the English practice does not apply to this case. That rule contemplates the necessity of proving something more than bare execution. *Lake vs. Skinner*, 1 *Jac. & Walk*, 15. (*Note* 1.)

In the present case bare proof of handwriting makes

the paper evidence. No collateral fact is necessary. Its effect is another question not now involved.

The rigor of the English rules excluding testimony at the hearing is relaxed in this country. *Barrow vs. Rhinelander*, 1 *John. Ch.* 559 ; *Consequa vs. Fanning*, 2 *Johns. Ch.* 482-3.

In *Hood vs. Pimm*, 4 *Sim.* 101, leave was granted to prove a will upon interrogatories, to remedy the inadvertence of counsel.

The practice of the Court has been uniformly to grant this indulgence. *Turner vs. Burleigh*, 17 *Ves.* 354 ; 1 *Barb. Ch. Pr.* 308 ; 3 *Greenl. on Ev. Sec.* 308-9-10.

Should the paper be inadmissible as an exhibit the Court is asked to take the proof *viva voce* under rule 45.

A distinct ground why the objection should be overruled is that an inspection of this paper having been called for and had, it is admissible in evidence for both parties.

I was early notified to file the paper in the Court ; application was made for an order on me. I voluntarily submitted it to the Counsel and they have had it in their possession.

*Gordon*, for the defendant, replied.

THE CHANCELLOR :—

It is the established course of this Court to proceed upon written evidence taken before a commissioner or an examiner. The examination of witnesses *viva voce* to prove exhibits at the hearing is an exception, and one sparingly admitted. Such proof has always been confined to a few classes of instruments, of such nature as to require only formal proof without cross examination ; such as *ancient documents*, which are proved by mere

evidence of identity and that they come from the proper custody ; *office copies,* which require only proof of accuracy by the proper officer, and by statute may now be proved by certificate ; *attested instruments*, as deeds, bonds, &c., which may be proved by simply calling the attesting witness, if he be living ; and certain *unattested instruments*, such as promissory notes, bills of exchange, letters or receipts, with respect to which the proof of handwriting of the party signing is sufficient. To these may be added, under our rule 49, the proof of private books of account by the oath of the party.

But it has been a rule strictly enforced, that where the proof of any paper would go beyond these few simple points and involve matter proper for cross examination, such paper cannot be proved *viva voce* at the hearing, but only under a commission. Hence it is that under the English practice a will would in no case be proved as an exhibit, because more was required to establish it than the ordinary formal proof of attestation. A compliance with the formalities of the Statute of Wills and the sanity with the testator were additionally necessary, and these are proper subjects for cross-examination.

This must be understood to refer to wills of lands, which under the English practice were not the subjects of probate, as were testaments of personal property, but were required to be proved in every controversy as to title under them. In this State the probate of a will before the register of wills is conclusive of all requisites to its validity, both as to real and personal estate ; and hence the record or a duly certified copy must in all cases be admissible as an exhibit at the hearing. *Harris vs. Ingledew*, 3 *P. W.* (93); *Eade vs. Lingwood*, 1 *Atk.* 203 ; *Niblett vs. Daniel, Bunb.* 310. So, although a deed might be proved as an exhibit by the attesting witness, if he were living and produced, yet if the witness were dead or beyond the jurisdiction, inasmuch as these were facts to be

proved before evidence of their handwriting could be ad-
admitted and were facts proper for cross examination, the
deed would no longer be proved at the hearing but only
under a commission. *Bloxton vs. Drewit, Prec. in Chanc.*
60. So a book was held inadmissible as an exhibit, in which
the collector of a former rector had kept accounts of the
receipt of tithes, because, besides evidence of handwriting,
it would be necessary to prove that the book came out of
the proper custody, and that the writer was the collector
of tithes. *Lake vs. Skinner* 1 *Jac. & Walk.* 9. And gen-
erally it may be stated, with respect to instruments which
ordinarily are admissible as exhibits, that when under the
particular circumstances of the case such an instrument
ought to be subjected to more than the formal proof of
attestation or handwriting the Court will not allow it to be
proved *viva voce* but only in the regular mode of taking
proofs at large. *The Earl of Pomfret vs. Windsor*, 2 *Ves.
Sr.* 479 is an example. It was the case of ordinary receipts.
The bill was filed against the defendent for an account as
administrator of Lord Jefferis. The administrator offered
to prove at the hearing receipts for certain debts of his
intestate which he had paid. Lord Hardwicke excluded
them as exhibits, because, the receipts not being ancient,
the bare proof of them ought not to charge the estate
without some evidence of indebtedness on the part of the
intestate, and, with respect to this, opportunity should be
afforded as compensation for cross examination and counter
proof in the regular course of taking testimony at large.
And for a like reason it is laid down as a general rule that
wherever an instrument is impeached by the adverse party
it cannot be proved as an exhibit at the hearing, as
against the party impeaching it. *Gresley's Eq. Ev.* 127 ; 2
*Daniells Ch. Pr.* 1028 (1*st. Am. Edn.*); 1 *Barbour's Ch.
Pr.* 310 ; 3 *Greenl. on Ev. Sec.* 310 ; *Barfield vs. Kelly*, 4
*Russ.* 355, (4 *Eng. Ch. R.*); *A. G. vs. Pearson* 7 *Sim.* 290 ;
*Mabur vs. Hobbs* 1 *Y. & C. Exch. Eq. R.* 585 ; *Hitchcock
vs. Carew* 1 *Kay*, 14 ; 2 *Dan. Ch. Pr.* 879 *note* 5,

*Perkin's ed'n*; *Joly vs. Swift*, 3 *S & L.* 126; *S. C.* 9 *Ir. Eq. R.* 195; 3 *Chitty's Eq. Dig.* 2131.

To this last class this present case belongs. The paper offered to be now proved as an exhibit is the agreement alleged in the bill as the basis of the relief sought. The defendant by his answer utterly denies having ever signed it, and avers that if he did sign it he was induced to do so by fraudulent misrepresentations as to its nature and contents? Such a paper ought not to be admitted on bare proof of handwriting without opportunity for full and deliberate cross-examination and for adducing counter evidence at large. It should therefore take the regular course of proof under a commission.

In the argument for the complainant much stress was laid upon the broad language of the rule of Court (the 49th) by which it is provided, that "proof may be made of exhibits of deeds, receipts and other instruments of writing by the instrumentary witnesses or evidence of handwriting." But all that is practicable by such a rule is to define generally what instruments are of the nature of exhibits without attempting to enumerate the exceptions and qualifications which are recognized in practice. These are to be ascertained only by the practice of the Court under the rule. The rule in question is, by no means a new one, though so treated by the complainant's counsel. It is an exact copy of the old and long established rule on this subject. It was without doubt originally adopted as a general expression of the English practice, according to which therefore it is to be construed and applied.

But it was argued with much earnestness that with us the stringengy of the English practice is needless because the proof of exhibits *viva voce* is here taken at the bar of the Court in the presence of counsel and subject always to cross-examination; and not, as in England, before the register, without the attendance of the counsel. Still, it may be questioned whether for all purposes, cross-

examination at the hearing upon short notice is of equal advantage with the regular course of proof. Another reason for adhering to the strict English practice was suggested by the Court in *Campbell vs. Johnston*, 3 *Del. ch.* 94 ; viz : that the proof of exhibits taken *viva voce* not being reduced to writing, could not be brought under review upon an appeal. Perhaps this reason is removed by the provision of the present rule 49, adopted since the decision referred to, for taking the proof of exhibits in writing. as a part of the record, when so required by either party? But another and quite sufficient ground for adhering to the strictness of the old practice is found in the necessity for some clear and sharply defined distinction between the proof of exhibits at the hearing and the proofs at large under a commission, without which distinction steadily enforced there would arise an uncontrollable tendency to give the business of the Court a *nisi prius* character to its great delay and embarrassment. *Chancellor Kent in Consequa vs. Fanning et al.*, 2 *Johns. Ch.* 481. It may be well to remark that the 45th rule referred to in argument as indicating a relaxation of the practice of taking proofs out of the Court contemplates no such result, but is a provision only for very special cases in which upon some particular point it may be found necessary for the satisfaction of the Court that a witness should be orally examined or re-examined in open Court. The rule will be very sparingly resorted to.

The conclusion is that the objection to the proof of this agreement as an exhibit is well taken. But the question remains whether leave shall be granted to prove the paper under a commissioner, the cause meanwhile to stand over.

It has been the settled practice of the court in its discretion to grant leave to supply evidence inadvertently omitted to be taken in the regular course, when it may be material to the justice of the cause and the omission has

been without bad faith or laches. Instance of this privilege abound. *Lake vs. Skinner*, 1 *J. & W.* 12 ; *Bloxton vs. Drewit, Prec. in Chanc.* 64; *Wallis vs. Hodgeson*, 2 *Atk.* 55 ; *Banks vs. Farquarhson*, 1 *Dickens* 167 ; (imperfectly reported in *Amb.* 145,); *A. G. vs. Thurnall*, 2 *Cox* 2; *Clark vs. Jennings*, 1 *Anst.* 173 ; *Cox vs. Allingham*, 1 *Jac.* 337. (4 *Eng. Ch. R.*); *Moons vs. De Bernales*, 1 *Russ.* 307 ; *Abrams vs. Winship, Ib.* 526 ; *Coley vs. Coley* 2 *Y. & J.* 44 ; *Hood vs. Pimm.* 4 *Sim.* 101, in which many cases are collected ; *Maber vs. Hobbs*, 1 *Y. & C. Exch. Eq. R.* 585 ; *Desplaces vs. Goris*, 5 *Paige* 252. In other cases the privilege has been refused but upon the ground of laches as in *Lake vs. Skinner* 1 *J. & W.* 9 ; *Wyld vs. Ward*, 2 *Y. & J.* 381 ; see also *Gresley's Eq. Ev.* 127; 3 *Green. Ev. Sec.* 310. These authorities are cited only to show the general practice of the Court. Cases on such a subject depend so much upon the special circumstances, that one can rarely be a precedent for another.

In the present case the omission to prove the exhibit in question under a commission was caused by a misapprehension of the complainant's solicitor as to the effect of the rule of court. The rule in its general terms would authorize the proof of the paper as an exhibit at the hearing, which is now excluded because the Court considers the rule to be qualified by the English practice, there having been no decision before settling the practice,—at least none known. The solicitor has acted in good faith and without laches ; and the omission can be supplied without surprise or detriment to the defendant. Leave is therefore granted to prove this exhibit under a commission, the cause meanwhile to stand over.

Afterwards proof of the exhibit was admitted by consent and the hearing of the cause proceeded.

*Patterson*, for the complainant.*

The agreement of August, 1864. is sufficiently proved, and establishes either a partnership or a trust. In either ease we are entitled to relief under our alternative prayer.

With respect to the alleged want of mutuality in the contract, an agreement founded upon an executed consideration is valid though binding on one side only. *Add. on Cont.* 22-3.

The real defense here is matter of avoidance and not direct denial, and must be proved by defendant and is not established by the answer. 2 *Cow. & Hill's notes to Ph. on Ev.* 285-6-7.

The allegation that the agreement is unconscionable is not of itself a ground of relief but only where it is found to be demonstrative of fraud, imposition, undue advantage, incapacity or the like. This case presents no such features.

There may be a community of profits without a partnership. *Sto. on Partn. Sec.* 32.

*Gordon* and *Bates*, for the defendant.

We deny that the execution of the alleged agreement is proved and its validity if proved.

1. It is void for usury, being upon a fair construction for a loan of money to be repaid at all events and more than six per cent. executed while the principal is not at hazard. *Com. on Usury p.* (22) (30) (119); *Leigh N P.* 483.

The cases of usury in contracts of partnership are few because of greater license allowed but the application o

---

* The hearing being on bill and answer, cross-bill and answer,—Mr. Pat terson opened the argument and Mr. Bates followed on the other side ; M Patterson then replied on the original case and was followed by Mr. Gordon i reply in the cross-cause.

the rule is clear and well defined. *Pars. on Cont.* 420; *Festons vs. Brooke, Cowp.* 793 ; *Morse vs. Wilson,* 4 *Term* 353.

2. Even if not void for usury the contract is so hard and unreasonable that it cannot be enforced in equity. 1 *Fonb. Eq. B. I. Ch.* 2, *Secs.* 12 & 13.

It is not mutual, not binding on complainant and conferring no advantage on defendant. *Add. on Cont.* 22.

THE CHANCELLOR :—

This case has a long history, one too familiar to counsel to need any detailed statement of it ; suffice it to say, that its present position, standing as it does upon the original bill and answer, and the cross-bill and answer, is equivalent to a reference to the Chancellor of the mutual demands of the parties for the purpose of obtaining a final decree in favor of the one party or the other, for such balance as may be found due to him, and at the same time for such disposal of the suits at law now pending as the result of this investigation may render proper. I proceed then in the first place to state what are the demands made on either side : and first as to the claim of the complainant. The complainant's claim as set forth in the original bill, is two-fold.

1. He claims an interest in certain lots, the title to which was conveyed to Dillon by deed from Ferris & Garrett, dated August 10th, A. D. 1864, alleging that the purchase of these lots was made on the joint account of the parties, pursuant to an agreement between them, the evidence of which is a written acknowledgment or declaration purporting to be signed by Dillon and which is in these words :

WILMINGTON, DEL., AUGUST A. D. 1864.

This is to certify and show that P. Plunkett of the City of Wilmington, New Castle County and State of Delaware, and I, Patrick Dillon of the same city and State, pur-

chased from Ferris & Garrett three hundred and seventy-five (375) feet of land fronting on Madison street from Second to Third streets, and in depth ninety-seven (97) feet, Philip Plunkett paying for the same the sum of three thousand dollars, ($3000,) for which I receive the deed for the same. But I acknowledge and agree for myself and my heirs that said Plunkett is to be paid back his three thousand (3000) dollars with interest, and receive as his share of the profits if any there shall be, two-thirds, and I one-third, and if a loss should be sustained, we are to bear it in the said proportion. In consideration of my receiving the deed, I executed this day a judgment bond for three thousand (3000) dollars for which I hold myself accountable until the property shall be sold, when the proceeds of such sale shall go to pay off said bond. Witness my hand the day and year above written.

(Signed)                    PATRICK DILLON.

WM. BRIGHT.

The complainant claims to be entitled under this agreement, first to the payment out of the proceeds of the real estate, of a balance alleged to remain due on the bond for three thousand dollars and interest ; next, to a share, being two-thirds of the net profits of certain parcels of the land which the bill alleges that Dillon has sold and with regard to which he has not as yet accounted for Plunkett's full share of profits ; and lastly, that Dillon shall also account to the complainant for his share under the agreement of the value of a portion of the land alleged to remain still unsold.

2d, The other branch of the complainant's claim embraces four particulars which are wholly unconnected with the real estate transaction. These are, 1st, Certain loans of money alleged to have been made to Dillon to the amount of nine hundred and fifty-four dollars and up-

wards, for which sundry due bills were given. 2d, Twenty eight dollars due for building stone furnished to Dillon. 3d, Three hundred and forty-one $\frac{77}{100}$ dollars with interest from January 1, 1865, due from Dillon as the surviving partner of the firm of Dillon & Plunkett, for balance of account alleged to be due and unpaid from the firm to complainant. 4th, Ten dollars, amount of a due bill of Dillon dated November 21, 1868, transferred to and held by the complainant.

Having thus set forth in the bill his original claims against Dillon, the complainant alleges that on the 28th of June 1869, the parties made a settlement between them of all accounts to that date, including the real estate transactions and others, which settlement resulted in a balance due Plunkett of $334.17, for which Dillon gave his note. The complainant, however, does not hold himself to the result of this settlement, but proceeds to allege specifically sundry errors in it. These errors relate chiefly to the proceeds of sale of certain of the lots which had not been included in the settlement. In addition to these the only other error specified was the omission to carry into the settlement the balance of account ($341.77) alleged to be due from Dillon as surviving partner of Dillon & Plunkett. The prayer of the bill is in the alternative depending upon whether the answer should admit or deny the alleged settlement. If the settlement should be admitted by the answer, the bill prays that it be established, but subject to correction of errors in it, and particularly of the errors specified in the bill. But if the settlement should be denied by the answer, then the complainant, having before admitted that he has no proof of the settlement except such as a discovery might afford, prays that Dillon may account at large for the proceeds of the lots sold, for the value of such as may remained unsold, also for all loans or advances in money made to him, also for stove or other merchandise furnished him by complainant, and general-

ly for any other credit to which complainant may be entitled in account with him. This prayer is for an account comprehending more than the claims alleged in the bill, and to that extent it is ineffectual. The issues in the cause as made by the allegations cannot be enlarged by the prayer so as to admit under the prayer proof of claims not previously alleged. But there is nothing in the evidence in the cause to make this point material.

The answer denies *in toto* that there was any agreement giving Plunkett an interest in the real estate ; it alleges that Dillon purchased it on his own account and became under the deed the sole owner ; that the $3000, paid to Ferris & Garrett for the purchase money, was borrowed from Plunkett as an ordinary loan upon the security of Dillon's judgment bond for that amount, the bond to be paid as his individual debt, and not as alleged in the bill to be reimbursed out of the proceeds of the real estate as an advance made by Plunkett on joint account. That consequently for all sums of cash paid over by him to Plunkett out of the proceeds of lots sold and for the securities resulting from said sales which had been assigned by him to Plunkett, he claims full credit in any settlement of accounts between them, Plunkett not being, as alleged in the bill, entitled to any share or interest in these cash sums or securities, and that he the defendant is entitled to a decree for such balance as may be found due to him upon the settlement of their mutual indebtedness on this basis. With respect to the settlement alleged by the bill to have been made on the 28th of June 1869, showing a balance of $334.17, due the complainant on that day, the answer though relied upon by the bill to prove such a settlement by discovery fails to do so. The complainant by his bill in the 10th paragraph states that with respect to this settlement he "is wholly without proof except by defendant's "confession, which it is one purpose of the bill to seek." And the interrogatories relating to this settlement are

framed broadly so as to elicit the whole of defendant's knowledge about it, and with the effect of making his entire answer on this point responsive and evidence. No testimony to establish the settlement is adduced by the complainant, so that the case on this point rests wholly upon the defendant's answer. The answer admits that the complainant on the 28th of June 1869 had prepared a statement of the accounts of the parties which was lying on his office table when the defendant called, that the complainant demanded as a balance due on this account $334.17 ; that the defendant gave for this balance his due bill, but without any examination of the account, reposing as he then did, full confidence in the complainant ; that soon after he discovered by calculations as to their accounts that the complainant was largely indebted to him, and then demanded a correct settlement which was refused. Taking the transaction at Mr. Plunkett's office on the 28th of June 1869, to be as here stated, the answer being made evidence, and the only evidence of it, I must hold it to be of no binding force as a settlement, and that the whole accounts are subject to settlement in this cause as fully as if no account had ever before been stated between them ; except in two particulars in which some effect is to be given to the transaction of 28th of June 1869. One is, that the note for $334,17 should stand as a security for any balance of account which upon a just settlement to be made in this cause, might be found due to the complainant. The other is that the credits given in that account to Dillon, are evidence as admissions in the hand writing of Plunkett. I may add however, that this effect of the account stated by Plunkett is of the less consequence, because all the credits given by that account to Dillon were admitted in argument by the complainant's solicitor. One word more as to this alleged settlement of 28th June 1869. Aside from its being unsupported by evidence, it is on its face not entitled to confidence. It is a very loose and careless statement ; it was not an account kept by regular entries made

from time to time, but appears on Mr. Plunkett's Day Book, where it must have been all entered at one time, and was manifestly made up for the occasion, from data, the source of which does not appear ; and besides there have been shown to be many and gross errors in it. The bill alleges and seeks correction of a number of errors against the complainant although the statement was made up by himself alone ; and there were, as alleged in the answer, and admitted by complainant's solicitor in argument, errors to the amount of about $2500. There is nothing to give the least credit to this statement of accounts except Dillon's acknowledged acquiescence in it, and that is neutralized by the fact with which his acknowledgment is qualified, viz.; that he acquiesced and gave his note without any actual examination, and though a blind confidence.   I shall therefore proceed to make a settlement *de novo* between these parties.  The first step necessary is to fix the basis of settlement so far as the real estate transactions enter into it, *i. e.*, to determine whether Plunkett was entitled to a share of the profits of the real estate.  For if so then Dillon with respect to his payments to Plunkett, of cash and assignment of securities realized from the real estate, is entitled in the accounts only to credit for his own share of the same, and remains still liable to Plunkett with respect to the value or future proceeds of the unsold real estate.  But if on the other hand, Plunkett did not hold the alleged interest in the real estate, then Dillon is entitled to full credits for all the assets paid over or transferred by him to Plunkett from sales of the real estate ; and with respect to what remains unsold, he holds it as sole owner, free from any claim upon it by Plunkett.  Further, the manner in which the $3000 bond is to be dealt with also depends upon the same question ; that is, whether it is to be on the theory of a partnership, charged as an advance, on joint account, against the proceeds of the real estate before any division of profit, or whether according to the defendant's claim of the exclusive title to the real estate, the bond is in the

settlement, to be charged against him as his individual debt.

We proceed then to the first material inquiry, and the one which formed the main subject of controversy, viz : whether Plunkett is entitled to credit for two-thirds of the net profits of the real estate which has been sold, and to the like share of the real estate remaining unsold. Plunkett's claim to such share rests upon the ground that he was a joint purchaser with Dillon of the real estate, for the purpose of re-sale in lots at advanced prices on joint account ; Plunkett to advance the purchase money as capital, Dillon to give his personal attention and labor, the profits and losses to be shared in the proportions of two-thirds by Plunkett and one-third by Dillon ; that Dillon took the title in his name only for the more convenient conveyance of lots to purchasers ; that the $3,000 secured by the bond was not a loan to Dillon but an advance on the joint account, to be repaid out of the gross sales before any division of profits, in short that the arrangement was a partnership, and Dillon with respect to the land and its proceeds, a trustee for the partnership. The evidence of this arrangement chiefly relied upon, is the alleged written acknowledgment of Dillon of August 1864. Connected with this paper as evidence tending to show the arrangement under which the real estate was purchased there are in proof certain declarations made by both Dillon and Plunkett. These declarations, however, are conflicting and inconclusive. Several witnesses, Megarity, Ellen B. Plunkett and James A. Plunkett, understood from Dillon's talk with them, that Mr. Plunkett took an interest in the property ; on the other hand Messrs. Gause, Capelle, and Simmons, in the discussion of the claims of these parties at the time of the attempted settlement, as clearly understood Mr. Plunkett's claim to be, not that he had advanced the $3,000 on a joint purchase, but as a loan to be repaid with interest and additionally a share of the profits. The true view of this

30—DEL. CH. IV.

matter is, that in getting at the real nature of the arrangement between these parties, no aid whatever is afforded by the understanding of third persons as to expressions carelessly used, and so liable to be misunderstood, as whether it was a "loan" or an "advance" which was spoken of, or whether it was two-thirds of the "property" or only two-thirds of the "proceeds" which Plunkett was to have. A misunderstanding or misrecollection as to the use of a single word, would in such a case make the whole difference ; and hence the conflict in the impressions of two sets of witnesses is easily accounted for without impeaching their veracity. They all had some previous notion about the transaction and readily construed what was said accordingly. The complainant's allegation of a joint purchase therefore must rest upon the memorandum of August 1864. Taking up this memorandum, I am of opinion that it is sufficiently proved. The grounds of this conclusion it is not necessary to detail. Further, it does on its face purport to be an acknowledgment by Dillon that the real estate was purchased by him and Plunkett jointly, and that the $3,000 was an advance on the joint or partnership account and not a loan. Nevertheless the manner in which these parties dealt with the property and all the transactions conclusively show that the arrangement was in fact and substance not a partnership between Plunkett and Dillon in the real estate, but a loan of money by Plunkett made to enable Dillon to purchase the real estate, the same to be repaid with interest and additionally with a share of the profits. And in a conflict between the words and acts of the parties as to what was the real nature and purpose of the transaction, the conclusion to be drawn from their acts must prevail. For plainly words or admissions however direct cannot make a partnership. Whether a particular transaction is in fact a partnership or a loan, must depend, not on what the parties may say or choose to call it, but upon their actual course of dealings in relation to it ; and the obligations

and responsibilities to which they do in fact hold each other.    Now I find it impossible to reconcile with the hypothesis that Plunkett was a joint purchaser of this real estate, the whole course of the transactions and dealings of these parties respecting it ; such transactions and dealings as are not at all in dispute.    The first and most stubborn obstacle to my construing this transaction as a joint purchase or partnership, is the fact incontestable, that the very object of the purchase of this land, was its division into lots and the erection on them of buildings preparatory to a sale of the lots with the buildings, in which adventure, the buildings were of course to form the chief element of expense and value; and yet confessedly Plunkett was to incur none of the expense of the improvements ; not even so much as the grading of the lots, a share in which expense was expressly repudiated on his behalf in the agreement.    It seems hardly conceivable that these two men, so shrewd and intelligent as the evidence makes them, should become joint purchasers and in equity joint owners of land, bought expressly for the purpose of improvement and resale, and yet that one of them should incur no expense and take no interest in the improvements. I can well conceive how one of them should lend his money to effect the purchase by the other upon a stipulation for a portion of the profits in addition to interest, either for the use of the principal, or in consideration of some risk to be incurred ; but that a joint interest should be taken in the land exclusive of improvements evidently contemplated to be immediately put upon it, is too gross an incongruity to be credited, unless it were shown on the face of the title papers ; whereas, in this case, the title papers show the direct contrary.    Then concurring to the same conclusion, viz : that the arrangement, whatever it might be, was not a joint purchase or partnership, is the whole course of conduct and dealing of these parties. The title is made to Dillon alone ; Plunkett takes no concern whatever with the real estate, its conditions, or mode,

or terms of disposal ; no partnership accounts are kept by either, or by any one employed by them ; the account kept by Plunkett being the only one in evidence, is an individual account between him and Dillon, in which the transactions connected with this real estate and others wholly disconnected with the real estate are intermingled, and in which it is especially observable that the $3000, which according to the case made by the bill of joint purchase, was to be paid only out of the proceeds of sale as they should be realized after sales made, is yet credited with two cash payments not received from the property, one of $100, and the other of $300, made in the very month of the purchase, August, 1864. So, later, in the same account, are other large credits given to Dillon, for payments not realized from the real estate, as credits which could apply to nothing but this bond, that being the sole debt due Plunkett ; such as the assignment of Bradford's note credited in the account, and upon the evidence the same may be said of the Curley note, the two amounting to over $1200. Then again, Plunkett contracts to buy one of the houses built by Dillon on the land upon the same footing precisely with other purchasers, strangers to all these transactions, and without the recognition of any joint interest held by him in the premises. Now it is true that some of the features of the case taken alone, might be reconciled with the existence of a joint interest in the land, but the bearing and force of the whole together is strongly against it ; so much so, as to leave a fixed conviction, notwithstanding the terms of the writing of August 1864, that there was no joint purchase nor any partnership ; that the $3000 secured by the bond, was not an advance upon the joint account, but a loan to Dillon, made to enable him to purchase the real estate ; with a stipulation that in addition to its repayment with interest, Plunkett should receive two-thirds of the profits upon the land ; the profits to accrue from the improvements. Of course I do not here decide whether or not Plunkett would have been liable as a part-

ner to third persons, but only what are the real relations of the parties and their rights and obligations as between themselves.

Then arises the question, whether the stipulations for a share of profits, in addition to interest on the loan is such as a Court of Equity ought to enforce. Several distinct objections were taken to it. First, it is objected that the stipulation is usurious. This objection when made at a former stage of the cause, on the motion to dissolve the injunction for want of equity in the bill, was overruled, because on such a motion the Court was bound to assume as true the allegation of the bill that the purchase of the real estate was joint, and that the $3000 was not a loan but an advance of capital on the joint or partnership account ; but upon the present hearing, which is on the bill, answer and proofs, the transaction is to be treated according to its real nature, as that shall appear upon the evidence ; and in my opinion already fully expressed, the real transaction was not an advance of capital, but a loan of money. This aspect of the case opens for consideration the question of usury, which, on the motion to dissolve, was closed by the allegations of the bill. It does not, however, necessarily follow, that because the $3000 was a loan the stipulation for a share of profits is usurious. It is an acknowledged exception to the statute, that where the principal is put at risk, more than the legal rate of interest may be received ; the excess, in such case, being allowed as a consideration of the risk of the principal in addition to the interest which is the consideration for the forbearance of the debt. Such are loans upon bottomry and respondentia, and *post obit* bonds ; and the principle may be considered a general one, not limited to these special cases, which are the ordinary instances of such loans. But it must be here particularly observed, that the risk of principal to come within this exception to the statute, must be a substantial one, *i. e.* it must be such a risk as a

prudent man could not be supposed to take for legal interest only. Such therefore, as must have formed a real ingredient in the contract and the true consideration for the additional profit stipulated for; being clearly and beyond doubt not colorable or intended only as a cover for exacting more than the legal rate of interest for the mere use of the principal. And in determining whether the risk be substantial or only colorable, the transaction will be subject to the most searching scrutiny, and will be dealt with according to its real nature and purpose without respect to the form or words in which it may be clothed, for by no contrivance or device can the Statute of Usury be evaded. On no point have the Courts expressed themselves with greater, if with equal emphasis. "Courts regard the substance of the transaction" says Lord Hardwicke, "and not the words of contracts." *Chesterfield v. Jansen*, 1 *Wil.* 286. Again, Lord Mansfield in *Lowe v. Waller*, *Doug.* 736, says, "the only question in all cases like the present is what is the real substance of the transaction, and not what is the color and form." C. J. Marshall, in *Scott v. Lloyd*, 9 *Peters S. C. R.* 447, says that "the Courts have perceived the necessity of disregarding the form and examining into the real nature of the transaction. If that be in fact a loan, no shift or device will protect it." The question there, was whether under the form of a sale of an annuity a usurious loan was really intended. Upon the distinction between substantial and colorable risks, the leading case uniformly recognized and followed is *Chesterfield v. Jansen*, 2 *Vesey Sr.* 125; 1 *Atk.* 301. 1 *Wilson* 286; That case was heard before Lord Hardwicke, assisted by the Master of the Rolls, and also by several of the Law Judges; and was most elaborately argued and considered. On the precise point now before us Lord Hardwicke thus lays down the rule, 2 *Vesey Sr.* (154) "if the contingency goes to both principal and interest, "and there is a higher rate than the law allows, regard is "had whether a *bona fide* risk is created by the contingency,

" or whether only colorable, for if so, Courts of Law hold
"it contrary to the statute, &c. But when the contingency
"has extended to principal and interest both, and not a
"colorable only, but a fair and substantial risk is created
" of the whole, it takes it out of the statute ; though called
"a loan it is considered a bargain or chance &c." The
other judges express themselves to the same effect. Mr.
Justice Burnett says, "The intent of the bargain is the
" material thing ; if that was borrowing the money, it is
" within the statute whatever colorable contingency is
" inserted ; and this is the sense of all the resolutions in
"the several cases. But where the principal was fairly
"and truly put in hazard, and such as none would run for
"the interest the law allows, there is no case where it
"has been held within the statute. The slightness or
"reality of the risk seems to be the only rule directing the
"judgment of the Court." Illustrations of what are
colorable risks are afforded by adjudged. cases in great
numbers. The older cases are collected in *Chesterfield
vs. Jansen*, and in *Comyn on Usury*, 5 *Law Lib.* (32.)
As where money is loaned for more than legal interest
the principal to be payable in six months if the bor-
rower, or his son, or any one else being in fair health
should be then living. *Mason vs. Abdy, Comb.* 125, 3 *Salk.*
390 and *Carth.* 67; *Button vs. Downham, Cro. El.* 643; *Bur-
ton's Case*, 5 *Co.* 70; *Kelly on Usury*, 75 *L. L.* (61) puts this
illustration of the difference between substantial and col-
orable risks, drawn from *Bedingfield vs. Ashley*; *Cro. El.* 741.
" The chance of five daughters being alive at the distance
" of ten years, was held sufficient risk ; for where one
"agreed with another in consideration of £100 paid down,
" that he would pay £80 a piece to each of the five daugh-
" ters that should be living at the end of ten years, the Court
"held it not usurious, and said, ' if it had been that he
" should pay at the end of one or two years £300, if any of
" said children were alive, that had been usury, for in all
"probability one of them would continue to be alive for so

" short a time, but in ten years are many alterations.'" A common mode of seeking to evade the statute by the creation of colorable risks, has been by the sale of annuities held by the borrower during his lifetime, the sale being for such a sum as would make the annuity while received equal to much more than legal interest on the sum paid for it, the annuity being at the same time made redeemable at the expiration of a limited period, by the repayment of the sum advanced upon it. Now suppose the annuitant to be living, and to redeem the annuity, the effect was precisely that of a loan of the amount advanced at an interest equal to the annuity, subject to the risk of the borrower's death meanwhile. In *Lawly vs. Hooper*, 3 *Atk.* 278, Lord Hardwicke held such a risk, although the period of redemption was indefinite, to be colorable, because the lender might insure the life of the borrower although such business would involve some risk. In *Richards vs. Brown, Cowp.* 770, where the money was advanced at usurious rates on the assignment of an annuity which at the end of three months was redeemed and converted into a loan, Lord Mansfield after looking into the cases, held that the risk the lender was under of the borrowers's dying within the three months was not sufficient to take the case out of the statute. "The borrower," he says, "was a hale young man, and therefore, we are of opinion there was no substantial risk to take this case out of the statute."

In the case before us the question of usury turns upon the operation of that clause in the memorandum of August 1864, which provides that Plunkett should receive the $3000, advanced by him with interest, out of the proceeds of sale ; also, that if a loss were sustained the parties should bear it in the same proportion in which they were to share the profits, *i. e.*, Plunkett two-thirds, and Dillon one-third. I assume that the effect of this provision, as was argued for the complainant, did make the $3000 pay-

able only out of the proceeds of the lots, and rendered Plunkett liable for a share of losses accruing from the purchase and sale of the lots.    The effect was to subject his principal to the risk of what ever depreciation in value the lots might possibly sustain before their improvement and sale.    Then the decisive question is, was this a substantial or only a nominal and colorable risk?    Four reasons which I propose to state distinctly, have concurred to bring me to the conclusion that this was only a colorable risk.

First then, there was in point of fact no possibility of a depreciation in these lots. The purchase was of a large lot or tract of land situated in an improving part of Wilmington, a city advancing rapidly in population, wealth and business. This tract was to be divided into city lots for immediate improvement and sale when improved.    This was a process morally certain to enhance the value of the lots. The result demonstrates this.    Dillon gave for the whole tract $8 per foot, on the 10th August 1864.    Eight days afterward, on the 18th of August he sold to Wm. Dougherty 16 feet at $12 per foot ; and on the same day to Thomas Curley 32 feet at $12 per foot, an advance of fifty per cent. upon the cost ; a profit accruing from the mere division of the larger tract into smaller lots, and the prospect of the erection of buildings on the remaining lots.    Two years afterward in July 1866, Dillon sold to Philip C. Hearn in one body 101 ft. 8 inches of this land unimproved at a fraction over $14 per foot, being an advance of 75 per cent. upon the cost. Thus much as to the lots sold unimproved. With respect to the improved lots which Dillon sold for gross sums, a large body of estimates made by witnesses were submitted by the complainant, the result of which was to fix the valuation of the improved lots at a considerable advance, the estimates on the lots ranging from $20 to $30 per foot. Altogether the sales of the unimproved lots and the valuation upon the improved lots lead to this conclusion ; that the advance in value of the lots was not in

31—DEL. CH. IV.

the least degree speculative, but was morally certain to result from the measures contemplated in the purchase, that there was no real risk of depreciation in the lots; that whatever losses might be incurred by Dillon in the improvements, none could spring from the lots. To apply the tests so well put in *Chesterfield v. Jansen*, the depreciation of these lots before they could be improved and sold to the loss of Plunkett's principal of $3000, was not such a real and substantial risk as must be supposed to have entered into the serious contemplation of the parties, to have formed a real ingredient in the contract, and the true consideration for the concession of two-thirds of the profits over and above interest.

In the second place, Mr. Plunkett evidently meant to take no risk in this business. He was careful to stake nothing upon the improvements to which the only hazard of losses could attach. He was content to share the profits in the land, which were certain, and in doing so to share also the chance of loss on the land alone, which is clearly nominal as the profit was certain. Just at the point where the question of profit and loss became one of substance he stopped. It is certain that help to build houses as well as to buy the land must have been acceptable to Dillon, and it is quite as certain that it would have been given to him by the formation of a real and substantial partnership in the whole enterprise, instead of a mere loan for the purchase of the land but for the consideration that in the building operations there were real risks, while in the value of the land there were none worth consideration.

Then we come to a third feature of the case, which strongly indicates that the memorandum of August 1864 was colorable, that is, its purporting to set forth a joint purchase or partnership, contrary to what the acts and transactions of these parties demonstrate to have been the real arrangement between them. This inconsistency between the memorandum and what the evidence discloses

as the real nature of the transaction, can only be explained by treating it as a veil to cover, under the guise of a partnership advance of capital, what was in fact and in substance a loan of money ; and it is pregnant evidence that the provision inserted in it of risk on the resale of lots, which as we have seen was in fact but nominal, was in intent colorable.

And now a last fact concurring with those before stated against the assumption that the share of profits was in consideration of any risk to Mr. Plunkett's capital, is his own statement of the ground on which he claimed these profits made to Mr. Gause at the time of the attempted settlement.   He claimed that " on account of his having "furnished this money ($3000.) to Dillon, he was to have "a certain share of the profits, two-thirds."   These are his words.   The claim to profits was not here made for risk, but for the accommodation in raising the money.

There is a general consideration that weighs very strongly with me in treating this as an usurious arrangement.   It is that the case is in a court of equity where such a decision operates less severely upon the complainant.   In a court of law usury operates as a forfeiture of the debt, and subjects the lender additionally to the penalties of the statute.   In this Court the whole effect of adjudging a loan to be usurious is to relieve the borrower from the exaction of more than lawful interest.   The lender is permitted to receive his debt with the interest. In a court of law where such consequences are to follow, the *onus* may well be upon the borrower to establish a clear case of usury ; but in a court of equity, where the lender is at all events to get his money with interest, he should be justly held to satisfy clearly the conscience of the court in allowing him a larger exaction.   Here precisely is the ground of my conclusion :  I am not sat - isfied that the mere chance of the immediate depreciation of these lots, while under the very process of im-

provement, was a sufficient risk to Plunkett's principal to raise an adequate consideration for the larger exaction of profits—two-thirds—in addition to the interest, and thus to take the case out of the statute.

Leaving now the question of usury, we come to another fatal objection to Plunkett's claim to a share of the profits ; that is, that the claim is, under the circumstances, grossly inequitable, such as even, were it not usurious, a Court of Equity will refuse to enforce. What is this claim ? It is to a share of profits for the creation of which, Mr. Plunkett has neither risked his money, nor given his personal labor. The utmost extent of his connection with this enterprise was to loan Dillon $3000, to enable him to purchase the land, the repayment of which money with legal interest was secured to him to his satisfaction at least. This is not like the case of a partner who upon an advance of capital to his firm may in addition to his advance with its interest, justly receive a share of profits, because there the partner's capital is at substantial risk, and he himself additionally is liable for the partnership debts. So here, if Mr. Plunkett had become a *bona fide* partner in the whole enterprise of purchasing, improving and selling the land, thus subjecting his capital to real risk, and assuming the substantial liabilities of a partnership, his claim to a share of profits as well as interest on capital would be equitable. But instead of a partner he was plainly but a money lender, and certainly if one person who lends his money at interest to help commence an enterprise, may without sharing its real hazards, equitably exact a portion of the anticipated profits, another person may with equal equity upon a further loan to help prosecute the enterprise to completion, exact the residue of the profits ; thus between them leaving as a return for the labor and skill of the adventurer all the risk and none of the profits. The practical effect of such arrangements is to place labor in a condition of absolute servitude

to capital, and they are not only inequitable in principle, but if permitted, would be ruinous in the general results. But not only is Mr. Plunkett's claim to any share of the profits inequitable in principle, but that it is in degree grossly so, will appear when we observe what is the share here claimed; this is not merely some portion of the profits, not even an equal portion, but two-thirds; the effect of which is, that the lender who risks nothing and has no labor, and is in any event to have the full legal compensation for the use of his money, takes nearly all the profits, leaving but a small portion to him who carries all the real risks of the enterprise and bestows all the labor. The practical result of the whole transaction, upon the complainant's theory, and its gross inequality, is strongly illustrated by the claim actually made in argument upon figuring up. Upon a rough calculation by the complainant's counsel, the claim made for him on account of profits was this: Upon the basis of the highest estimates of the advanced value of the land $3379.80: Upon the basis of the average estimates of the advanced value of the land, $2988.35.—The effect therefore was to double the complainant's principal in addition to giving him legal interest, and that upon a transaction which was closed in about five years.

Now with respect to the principles upon which this Court deals with what are usually termed hard and unconscionable bargains; they have been settled so clearly and authoritatively as to need little more than a statement of them. The rule is this; where the contract has been already executed, or the party having the advantage under it can enforce it at law without the aid of a court of equity, this Court will not interfere to set the contract aside, or to restrain a party seeking his legal remedy under it, on the mere ground that the contract is hard or unreasonable, where there has been no fraud or mistake, or the party hardly dealt with, is not mentally incompe-

tent, or of a class which is under the protection of courts of equity, such as heirs dealing with expectancies. But on the other hand, where a hard contract remains yet executory, and the party not being able to effect his unconscientious advantage at law, seeks the aid of a court of equity, it will not help him. In such case, though there were no fraud nor mistake, and though the party hardly dealt by, was not incompetent nor a special subject of the court's protection, such as an heir expectant ; still the court will decline to interfere. The rule cannot be better stated than by a very great authority, Lord Hardwicke in *Barnardiston vs. Lingood* 2 *Atk.* 134, where he says, "In the case of a hard bargain, where it "is not absolutely executed, but executory only, the con- "stant rule of the court is not to carry it into execution." The principle on which this rule rests is, that a court of equity will not be made the instrument of hard and unconscientious dealing. If the party has already secured his advantage through the execution of the contract, or if he can secure it at law, this Court will not, unless on the special ground, just referred to, molest him ; but at the same time will not help him. The present case affords an apt illustration of the principle—Plunkett has invoked the aid of this Court by a decree for a discovery and an account to enable him to recover the share of profits claimed in addition to his principal and interest. The Court then will look to see whether he is seeking a hard advantage against equity and good conscience, and if so, will not lend itself to such an object. This mode of dealing with executory contracts has received its most common application in cases of bills for specific performance. In a case of that class, *Godwin vs. Collins*, 3 *Del. Ch.* 189, it was very fully considered by this court, and the principles then applied being the same just stated, were approved by the Court of Errors and Appeals. This present bill so far as it seeks to have the stipulation for a share of the profits carried into effect, is in substance a

proceeding for specific performance, and is subject to the same principles. But at all events the doctrine that the court will not enforce an unconscientious contract while it remains executory, is a universal one applying as well to loans as to contracts for the sale of land. In *Lawley vs. Hooper*, 3 *Atk.* 278, where an annuity had been purchased on very hard terms, and the main question was whether the transaction was not a usurious loan under cover of a sale, Lord Hardwicke after considering that question, added, " but I do not think I am under any " absolute necessity to determine this point, for I am of " opinion that this is such an agreement as this court ought " not to suffer to stand, taking it as an absolute sale." In that case the court considering that advantage had been taken of a party's distress, went so far as to set aside the sale on his application. In *Jestons vs. Brooke, Cowp.* 793, the defendant wishing to purchase some goods and not having the money, the plaintiff loaned it to him upon the defendant's note payable on demand, with a stipulation that he should have half the net profits upon a resale of the goods, over and above the note. The plaintiff by making immediate demand entitled himself to interest, and thus he claimed both debt and interest and additionally a share of the profits of the transaction, without incurring any risk as a partner in it. That case is essentially like the present one as it is now developed by the whole evidence, though different from that made by the bill, on the point of risk, as I considered it on the motion to dissolve the injunction for want of equity in the bill. The court in *Jestons vs. Brooke*, held the contract to be not only usurious, but also an unconscionable bargain, such as even a court of law would not enforce in that action, which was for money had and received ; it being as Lord Mansfield said " analagous to a bill in Equity. After considering the question of usury, Lord Mansfield proceeds to say, "suppose it was not strictly usurious, " shall a man in an action for money had and received,

" which is an equitable action and founded in conscience,
" recover an unreasonable and exorbitant demand as this
" is ? most clearly he shall not."

The objection now under consideration, that is the
gross inequitableness of the claim to profits in addition to
interest, is fatal, whatever view we may take of the
arrangement between these parties.    Even treating them
as joint purchasers upon the theory of the bill, and that the
$3000 was an advance of purchase money, the stipulation.
for almost the whole of the profits on the lots received,
without either risk or labor to be incurred by Mr. Plunkett
or anything done by him but advance his money at legal
interest, was an unreasonable and exorbitant arrange-
ment, which although if executed, a court of equity
might not disturb, yet it will decline to enforce.

There is a broad and fundamental maxim of equity
which reaches into this case, and which is alone decisive
of it ; that is, that he who seeks equity shall do equity.
Mr. Plunkett has sought the interposition of this Court
to effect a settlement of these transactions even to the
extent of withdrawing the controversy from the courts
of law.    In such case the course of the Court is to adjust
between the parties all the equities arising out of their
transactions, requiring that the complainant do, as well
as receive, equity.    It is precisely on this principle that
when a borrower of money on usurious interest comes
into a court of equity for relief against the lender, it
will oblige him to repay the debt with lawful interest,
upon being relieved of the usurious excess.    So here,
upon the like principle, the Court will oblige Mr. Plun-
kett to relax an unconscientious claim to a share of
the profits, even supposing such share to have been stip-
ulated for, at the same time decreeing the repayment of
the money loaned by him with the lawful interest.    After
much and anxious reflection upon the whole case, I am

decidedly of opinion that this course and no other, will effect equal and exact justice between these parties.

After the announcement of the opinion of the Chancellor and of the allowances and disallowances made by him in the accounts of the parties, the counsel agreed upon a statement based upon the decision, and showing in conformity therewith a balance due from Plunkett to Dillon of $4626.10, for which a decree was entered under the cross bill ; the decree also perpetually enjoined the collection of the $3000 judgment, and ordered the canceling and delivery up of the due bill of June 28, 1869 for $334.17, and for costs. Upon the original bill a decree was entered dismissing the bill with costs and dissolving the injunction heretofore issued against the suits at law.

NOTE. From both decrees an appeal was taken by the complainant in the original bill. The Court of Errors and Appeals differed with the Chancellor as to the effect of the evidence upon the question of partnership, holding that the proof was of a contract of partnership and not of an usurious loan. The decree was accordingly modified by the allowance to Plunkett of $3230.82 as the two-thirds of the profits claimed leaving due to Dillon the sum of $1.532.53. As to all other matters determined the decree was affirmed. *See.* 4 *Houston's Del. Rep.* 338.